635 So.2d 343 (1994)
Barton W. LONGMAN, Sr.
v.
ALLSTATE INSURANCE CO. and Earl J. Beechler, Jr.
No. 93-CA-0352.
Court of Appeal of Louisiana, Fourth Circuit.
March 29, 1994.
Rehearing Denied May 12, 1994.
*346 Brian J. Waid, Bubrig, Waid & Conner, Buras, for plaintiff/appellant.
Boggs, Loehn & Rodrigue, Charles A. Boggs, Betty P. Westbrook, New Orleans, for defendants/appellees.
Before BARRY, ARMSTRONG and JONES, JJ.
JONES, Judge.
Plaintiff, Barton Longman, Sr. appeals a jury verdict dismissing his claims against defendant, Commercial Union Insurance Company. The judgment was subsequently amended and made the judgment of the court by the trial judge.

FACTS
Plaintiff, Barton Longman, Sr., was injured in a motor vehicle accident which occurred on Highway 23 in Plaquemines Parish on September 25, 1989 at approximately 5:00 A.M. At the time of the accident he was driving his employer to the airport in New Orleans. The vehicle which he was driving was a parish owned vehicle. The driver of the other vehicle, Earl Beechler, Jr., admittedly rounded the curve in the wrong lane, thus causing the accident. The plaintiff was thrown out of the car. His memory of the accident was hazy. He recalled seeing the headlights on the other vehicle and swerving to the right. His next memory was of awakening in the hospital where he remained for four days. Upon being released from the hospital, he stayed home for approximately four weeks. He subsequently returned to work, but he continued to have problems with dizziness. He was later diagnosed as suffering depression.
Plaintiff is now required to wear eyeglasses and his eye doctor testified that he has a greater risk of developing cataracts and glaucoma. Plaintiff had a large scar on his face resulting from sutures to close a facial injury from the accident. He subsequently underwent plastic surgery to improve the appearance of the scar. Plaintiff initially filed suit against Mr. Beechler and Mr. Beechler's insurer, Allstate Insurance Company. He later added Boh Brothers, Mr. Beechler's employer; National Union Insurance Company, Boh Brothers' insurer; and Commercial Union Insurance Company, the insurer of the parish owned vehicle which the plaintiff was driving at the time of the accident. Plaintiff alleged that Commercial Union provided uninsured/underinsured (UM) insurance coverage and was obligated to pay the plaintiff. Plaquemines Parish intervened to recover worker's compensation benefits that it had paid to the plaintiff. The State of Louisiana, through the Department of Transportation and Development, was later added as a third party defendant. Upon completion of the plaintiff's case and prior to the time that the *347 case went to the jury, the plaintiff reached a settlement with defendants Beechler, Allstate and DOTD. Boh Brothers and its insurer, National Union Insurance Company, were dismissed on a motion for a directed verdict.[1] Thus, the only defendant remaining in the case at the time that the jury commenced its deliberations was Commercial Union Insurance.
The jury returned a verdict finding that defendant Beechler was negligent in causing the accident; but specifically found that defendant Beechler was not intoxicated at the time of the accident. The jury assigned 70% fault to Beechler and 30% fault to DOTD. The jury further found that Commercial Union did not provide uninsured motorist coverage for this accident. The jury awarded a total of $195,000.
Pursuant to the jury verdict, the court dismissed the plaintiff's claims against Commercial Union. In response to the plaintiff's motion for new trial and/or JNOV, the trial judge set aside the jury's finding that DOTD was 30% at fault and ruled that defendant Earl Beechler was 100% at fault for the accident. In all other respects the trial court denied the plaintiff's request for a new trial.
Plaintiff appealed the judgment of the trial court, arguing numerous assignments of error. Commercial Union answered the appeal and argues as its sole assignment of error that the trial court erred in setting aside the jury's finding that DOTD was 30% at fault.

DISCUSSION AND LAW

Receipt of Worker's Compensation
In his first assignment of error, plaintiff argues that the trial court erred in failing to grant a new trial due to Commercial Union's elicitation of testimony and argument that Mr. Longman had received worker's compensation benefits.
During the trial of the case two references were made to the receipt of worker's compensation benefits by the plaintiff. The first reference occurred while Howard Wilcox, the insurance manager for the parish, was testifying. On direct examination, the following exchange took place between Mr. Boggs, counsel for Commercial Union, and Mr. Wilcox:
DIRECT EXAMINATION BY MR. BOGGS:
Q. Has the Parish ever purchased uninsured motorist coverage?
A. Not to the best of my knowledge. We never purchased uninsured motorist because Parish vehicles are assigned to employees in the scope of their employment. And maybe it should be, if I am in order to explain. Uninsured motorist is for bodily injury sustained while driving say an automobile and people that are in it and you are in the right and the other party has no insurance and you can collect on uninsured motorist. However, the Parish, (sic) it is their employees and they have workmen's compensation which is required under the law and that pays medical payments and wage benefits and this has been done in Mr. Longman's case and
The second reference to the receipt of worker's compensation was made in closing argument wherein counsel for Commercial Union made the following statement:
... The fact that there is no U.M. (sic) coverage on any of these other things and the Parish didn't want to buy because they wanted to save the taxpayer's money. It is not covered. Now, the reason besides saving money that the Parish didn't want to buy that and gave Mr. Wilcox the authority not to buy it, is because he said it was duplicative (sic), duplicious (sic). And what they explained was, that a man who is in the course of his employment, like Mr. Longman was, gets paid his medicals and he gets paid compensation. And there is no reason to buy additional coverage at the taxpayer's money.
The plaintiff's counsel objected to the first reference to the payment of worker's compensation benefits and the trial court sustained the objection. However, when plaintiff's counsel objected to the reference to the *348 payment of worker's compensation benefits made during closing argument, counsel for Commercial Union maintained that the evidence was relevant to the motivation for the authorization given to the witnesses. The trial court apparently agreed because it noted the objection of plaintiff's counsel but overruled the objection and instructed the jury as follows:
Ladies and Gentlemen, the receipt or not of workmen's compensation or any benefit of any nature by Mr. Longman is not to be considered by you in the assessment of damages.
To the extent that any reference to his receipt of workmen's compensation may be construed by you as evidence of that fact, it is to be totally disregarded by you and not to be taken into account in the assessment of damages in this matter....
Commercial Union argues that information relating to the payment of worker's compensation was directly relevant to the issue of the intent of the Parish in rejecting UM coverage. Further, Commercial Union argues that the carefully drafted instruction given by the trial judge to the jury to not consider the receipt of worker's compensation cured any potentially harmful prejudice that could possibly have resulted from informing the jury of this fact. In support of the latter contention, defendants point to the fact that the jury awarded the plaintiff $35,000 for past and future medical expenses and $5,000 for loss of earnings and earning capacity. This fact, the defendant argues, tends to negate any finding that the plaintiff was prejudiced by this evidence, particularly in view of the fact that at the time of trial his medicals came to approximately $21,300.
The issue of the admissibility of evidence concerning the receipt of worker's compensation benefits is specifically addressed by La. Code Evid. art. 414 which provides:[2]
Evidence of the nature and extent of a worker's compensation claim or of payment of past or future worker's compensation benefits shall not be admissible to a jury, directly or indirectly, in any civil proceeding with respect to a claim for damages relative to the same injury for which the worker's compensation benefits are claimed or paid. Such evidence shall be admissible and presented to the judge only. (Emphasis added)
Pursuant to this article, the Legislature has evidenced its intention to impose a blanket prohibition upon the admissibility of information on the payment of worker's compensation cases in tort actions such as the present one where the plaintiff is seeking damages relative to the same injury for which worker's compensation benefits were claimed or paid.
It has been suggested that La.Code Evid. art. 414 should be interpreted to simply mean that the specified evidence concerning worker's compensation benefits is inadmissible if offered to minimize the plaintiff's claim by revealing that the plaintiff has already been compensated in part or to the extent of his prior compensation. See Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law (1992) (Authors' Notes, pages 286-287). These commentators recognize that such evidence may be admissible for other purposes, for example to attack the credibility of a witness.
Additionally, these commentators, when discussing similar language contained in La. Code Evid. art. 413, acknowledge that the language of article 413 "is phrased in more absolute terms" than the language of article 408 which only excludes evidence of settlements for certain specified purposes. These commentators opine that articles 413 and 414 should not be given such broad scope as to absolutely prohibit the introduction of such evidence. These commentators further suggest that such evidence should be held to be admissible subject to the balancing test of article 403 which provides "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." We disagree with the commentators' interpretation.
*349 Where a statute is clear and unambiguous, the court must give credence to the mandate expressed by the Legislature and cannot resort to construing a statute based on the spirit of the law as opposed to the plain wording of the law. Pursuant to La. Code Evid. art. 402 all relevant evidence in a case is admissible, "except as otherwise provided by ... the Code of Evidence." In the case sub judice the Legislature has enacted a specific prohibition to govern the admissibility of evidence of payment of worker's compensation benefits. Thus, while we believe this evidence was relevant to the intent of the insurance manager in rejecting uninsured motorist coverage, the Legislature has specifically directed that such evidence is not admissible.
In reaching this conclusion we are mindful of the fact that such evidence may be admissible pursuant to the Federal Rules of Evidence. In the federal system the courts have been hesitant to allow admission of the receipt of compensation benefits even to prove matters other than liability of damages. See: Phillips v. Western Co. of North America, 953 F.2d 923 (5th Cir.1992). Also see: Tipton v. Socony Mobil Oil Company, 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4 (1963) wherein the court held that evidence of the receipt of compensation benefits was inadmissible to prove a party was a longshoreman and not a seaman. However, in certain limited situations, the admission of evidence of the receipt of compensation benefits has been upheld where there was little likelihood of prejudice and no strong potential for improper use existed, and a carefully worded qualifying instruction was given to the jury. Savoie v. Otto Candies, Inc., 692 F.2d 363 (5th Cir. 1982); Franklin v. Sandersville R.R. Co., 445 F.2d 270 (5th Cir.1971).
However, Commercial Union's reliance upon the federal cases to support its contention that the evidence was admissible is misplaced since the Federal Rules of Evidence does not contain an express prohibition similar to the prohibition in La.Code Evid. art. 414. In light of our state's specific rule prohibiting the admission of such evidence, the federal cases are not applicable.
Reference to the federal cases may, however, be helpful to determine whether the erroneous admission of evidence of payment of compensation benefits can be considered harmless error. In the case sub judice, the instruction given to the jury was indeed limiting. Moreover, the evidence regarding the payment of compensation benefits does not appear to have had a prejudicial effect since the jury specifically awarded the plaintiff $35,000 for past and future medical expenses and $5,000 for loss of earnings and earning capacity, notwithstanding the fact that at the time of trial the plaintiff's medicals only came to approximately $21,300.[3] For this reason, we find that in the instant case, admission of this evidence was harmless error.

Erroneous Jury Charges and/or Interrogatories
In his second and third assignments, the plaintiff complains of the actions of the trial judge in giving an erroneous interrogatory on the issue of UM coverage and failing to give several interrogatories which had been requested by the plaintiff.
In assignment of error two, plaintiff argues that the trial court erred by improperly placing the burden upon plaintiff to prove that Commercial Union's policy did not provide UM coverage, instead of requiring the defendant to prove that Plaquemines Parish Government had validly rejected UM coverage.
In connection with this assignment of error plaintiff argues that the trial court erred by submitting the following interrogatory to the jury pertaining to UM coverage:
Do you find that Commercial Union Insurance Company provided uninsured motorist coverage that is applicable to this accident?
Plaintiff argues that this interrogatory improperly shifted the burden of proof to the plaintiff to prove that Commercial Union provided uninsured motorist coverage as opposed to notifying the jury that the burden of *350 proof was on the defendant, Commercial Union, to show that a valid rejection of uninsured motorist coverage was obtained from the insured and/or his authorized representative. Plaintiff correctly notes that the burden of proving the existence of a valid rejection of UM coverage is upon the insurer. Henson v. Safety Insurance Co., 585 So.2d 534, 538 (La.1991); Aramburo v. Travelers Insurance Co., 426 So.2d 260, 261 (La.App. 4th Cir.1983). However, in our opinion the complained of interrogatory is neutral, straightforward, and not confusing.
Moreover, a review of the entire record reveals that when viewed in conjunction with the jury instructions, this interrogatory did not place the burden of proving that Commercial Union's policy did not provide uninsured motorist coverage on the plaintiff. Rather, the trial judge correctly defined the burden of proof for establishing whether uninsured motorist coverage had been rejected when it gave the following instruction to the jury:
You have heard evidence in this matter as to whether Commercial Union provided uninsured motorist coverage on their policy of liability insurance protecting the District Attorney's Office and the Parish Government in effect at the time of this accident.
When an automobile liability policy is issued in the State of Louisiana, uninsured/underinsured motorist coverage attaches by operation of law unless the insured or its legal representative validly rejects that coverage in writing. The insurer has the burden of proving, by a preponderance of the evidence, that a valid rejection was perfected. (Emphasis added)
This instruction correctly delineated the respective burdens of the parties. Thus, the trial court did not err in submitting the complained of interrogatory to the jury.
In his third assignment of error, plaintiff argues that the trial court erred in failing to instruct the jury as to circumstances under which a new policy must issue.
Plaintiff argues that the trial court erred when it failed to give the following jury charge:
Whenever a "new" policy is issued, a previously executed rejection of UM coverage becomes invalid and a new UM rejection must be executed. If a new UM rejection is no (sic) executed, the new policy automatically includes UM coverage.
When the insured named in the policy has changed, a new policy must be issued...
As stated previously, we have reviewed the entire jury instructions given by the trial judge and conclude that on the whole the jury instructions were fair and complete. More specifically the following instruction correctly advised the jury of the need for a new rejection when a new policy issued:
In order for a rejection of uninsured motorist coverage to be valid, the rejection must be in writing; it must be clear and unambiguous; and it must be signed by the insured or the insured's authorized representative. Once made, this rejection applies to all renewals or substitute policies that the same insurer issues to the insured. This rejection would not apply to a new policy. A renewal policy means the issuance and delivery by an insurer of a policy replacing, at the end of the policy period, a policy previously issued and delivered by the same insurer. Any insurance policy terminating at a specified date may be renewed or extended at the option of the insurer and at a premium rate then required for a specific additional period. This renewal may be by endorsement of the policy and does not require the issurance (sic) of a new policy.
In his fourth assignment of error, plaintiff argues that the trial court erred in failing to instruct the jury as to the "legal representative" of a governmental body.
In reference to the duties of a legal representative, the trial court gave the following instruction:
Where a governmental body is insured and wishes to waive uninsured motorist protection, an authorized representative can execute the waiver form. The authority or not of such a representative is a question which must be determined from the circumstances *351 surrounding his actions, and the facts of this case.
We find no error in the giving of this charge; nor do we believe it was incumbent upon the trial judge to give the charge which the plaintiff requested.
Additionally, after the trial of the matter, the trial court made an independent finding that as a matter of law, Commercial Union did not provide UM coverage for the benefit of the plaintiff. Thus, any error in any instructions or interrogatories given to the jury on this issue had no relevance on the ultimate outcome of this litigation. For this reason, plaintiff's assignments of error on erroneous jury instructions or interrogatories have no merit.

Rejection of UM Coverage
In his fifth, sixth and seventh assignments of error, plaintiff argues that the trial court erred in finding that Plaquemines Parish Government had validly rejected UM coverage, where there was no written rejection by the named insured. In these assignments of error plaintiff argues that defendants failed to prove that a valid rejection of UM coverage had been made.
More specifically, in his fifth assignment of error, plaintiff argues that at the time of the accident the named insured on the policy was Plaquemines Parish Government, while at the time that the policy had been signed by Mr. Wilcox rejecting UM coverage, the named insured was Plaquemines Parish Commission Council. Thus, plaintiff argues that since Plaquemines Parish Government constituted a new legal entity, a new rejection of UM coverage was mandated by the provisions of La.R.S. 22:1406(D)(1)(a) which mandates a current valid rejection by the named insured.
In his sixth assignment of error, plaintiff argues that since Mr. Wilcox had signed the application rejecting UM coverage, material changes consisting of the addition and deletion of numerous covered vehicles had occurred. This change, according to the plaintiff, also necessitated the execution of a new rejection of UM coverage.
Finally, in his seventh assignment of error, plaintiff argues that the trial court erred in finding that Howard Wilcox, the insurance manager for Plaquemines Parish was authorized to reject UM coverage on behalf of Plaquemines Parish Government.
Having reviewed the entire record, we conclude that the evidence fails to show that Mr. Wilcox had the authority to reject UM coverage or that the parish as a body had made the decision not to purchase UM coverage. Since we find that assignment of error number seven has merit, we pretermit a discussion of the arguments raised in assignments of error five and six.
The burden of proving a valid rejection of UM coverage rested with Commercial Union. See Desormeaux v. Lalonde, 578 So.2d 226 (La.App. 3d Cir.), writs denied, 581 So.2d 705, 706 (La.1991), wherein the court stated:
When an automobile liability policy is issued, uninsured/underinsured motorist coverage attaches by operation of law, unless the insured or its legal representative validly rejects the uninsured/underinsured motorist coverage in writing. La.R.S. 22:1406(D)(1)(A). When the insurer asserts that there has been a rejection of uninsured/underinsured motorist coverage, it is the insurer, not the injured party, who bears the burden of proving a valid rejection. Aramburo v. Travelers Ins. Co., 426 So.2d 260 (La.App. 4 Cir.1983), writ den., 433 So.2d 161 (La.1983).
Commercial Union maintains that the Parish Council granted Wilcox, as insurance manager, a mandate to administer the insurance needs of the City and that this implicitly included the right to reject uninsured/underinsured motorist coverage, since the Parish already covered the employees operating parish vehicles under its worker's compensation plan. Commercial Union maintains that Mr. Wilcox had been granted actual authority to handle all insurance matters for the Parish and that pursuant to a resolution dated July 19, 1978 had the actual legal authority to cancel or reject on behalf of the Parish any unwanted uninsured/underinsured motorist coverage.
In support of its contention that Mr. Wilcox had the authority to reject UM coverage *352 for the Parish, Commercial Union introduced into evidence an undated application for insurance on behalf of the Plaquemines Parish Commission Council and the District Attorney's Office and various renewal automobile liability insurance policies issued by Commercial Union to the Parish. The undated application form indicated that the policy was to become effective February 14, 1986. Mr. Wilcox signed the block on the application purporting to reject uninsured/underinsured motorist coverage for the Parish.
Additionally, at the trial of the case, Mr. Wilcox testified that one of his duties, as the Superintendent of Insurance was to purchase insurance on all Parish vehicles. He testified that pursuant to a resolution of the Council authorizing the purchase of liability insurance, he was the person who signed the insurance policy with Commercial Union. He also identified his signature on the application portion of the policy wherein he personally checked the box rejecting UM coverage. He testified that because the Council had not passed a resolution authorizing the purchase of UM coverage, he did not have any authority to purchase such insurance. He testified that the Parish had no intent to purchase uninsured motorist insurance as they considered it duplicitous since they already had worker's compensation coverage for the employees. Mr. Albert Beshel, the Councilman who introduced the resolution regarding the purchase of the insurance, also testified that the Parish had no intent to purchase uninsured motorist coverage.
We have examined the resolution relied upon by Mr. Wilcox to support his belief that he had no authority to purchase UM coverage. This resolution is a resolution making the Parish self-insured and authorizing the cancellation of its automobile liability insurance polices except for vehicles utilized by the Sheriff's Department, The Council and the District Attorney's office. The resolution specifically authorizes the purchase of liability insurance, but is completely silent on the issue of whether UM coverage is to be rejected. The fact that the Council did not pass a specific resolution rejecting UM coverage negates any authority on the part of Mr. Wilcox to reject such insurance on behalf of the parish. The fact that he did not believe he had any authority to purchase UM coverage and that he believed he only had authority to purchase liability insurance for the Parish does not make his rejection of UM coverage valid. Given the clear mandate of favoring UM coverage, we cannot hold that the resolution in question supports a finding of a valid rejection.
In the case sub judice, Commercial Union was the party seeking to prove that a valid rejection of UM coverage had been made. Yet, Commercial Union produced no other evidence to show that Mr. Wilcox was formally and actually authorized or empowered by the Parish to reject UM coverage for the Parish. Nor did Commercial Union prove that Mr. Wilcox had apparent authority to reject UM coverage. For these reasons, the jury and the trial court erred in finding that a valid rejection of UM coverage had been executed.

INTOXICATION AND EXEMPLARY DAMAGES
In his eighth and ninth assignments of error, plaintiff argues that the trial court erred in finding that Mr. Beechler was not intoxicated at the time of the accident; therefore, the trial court erred in failing to award exemplary damages.
Pursuant to La.C.C. art 2315.4 exemplary damages may be awarded when the injuries on which an action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries. Since both the jury and the trial judge specifically found that Mr. Beechler was not intoxicated at the time of the accident, it was not necessary to address the issue of whether exemplary damages should be awarded. We find no manifest error in the findings of the judge and jury that Mr. Beechler was not intoxicated at the time of the accident.
Admittedly, evidence was introduced from which the jury could have found that Mr. Beechler was intoxicated at the time of the accident. He had consumed several Bloody Marys the evening or night before the accident *353 and he had 2 or 3 cans of beer the morning of the accident. His blood alcohol level when taken approximately two hours after the accident was .07%. According to Dr. Samuels, this meant that it was probably.10-.12% at the time of the accident. In Dr. Samuels' opinion this meant that some impairment of his motor sensory abilities existed. However, Dr. Samuels admitted that at that level 99% of the population would pass a field sobriety test.
Deputy Bartholomew testified that Mr. Beechler did not appear to be intoxicated. He did not smell any alcohol on his breath and he did not notice any unusual conduct on the part of Mr. Beechler. In fact, he testified that Mr. Beechler was walking around and making efforts to assist the accident victims. Mr. Beechler testified that he did not feel that he was intoxicated at the time of the incident. Mr. Beechler was never charged or convicted of driving while intoxicated. Although the plaintiff presented expert testimony of impairment, he did not establish by a preponderance of the evidence that Mr. Beechler was intoxicated at the time that the accident occurred.
Moreover, assuming arguendo that intoxication was proven, this court would also have to make a finding of fact that Mr. Beechler's conduct constituted wanton and reckless conduct in order for the plaintiff to recover exemplary damages. The record before us does not support such a finding.

Exclusion of Expert Testimony
In his tenth assignment of error plaintiff argues that the trial court erred in excluding expert economic testimony, which was correlated to the extensive expert psychiatric testimony in respect to loss of enjoyment of life.
Prior to trial, the trial court granted the defendants motion in limine to exclude the testimony of Stan Smith on the issue of hedonic damages for loss of enjoyment of life. Consequently the plaintiff did not call Stan Smith to testify at the trial of the case. However, his deposition was taken and submitted into the record as a proffer.
The issue of whether evidence of hedonic damages is properly admissible was addressed in Foster v. Trafalgar, 603 So.2d 284 (La.App. 2nd Cir.1992) wherein our brethren in the second circuit ruled that expert testimony of an economist on this issue was not admissible. In that case the court gave the following reasons for excluding such testimony:
As long ago as 1856, the Louisiana Supreme Court ruled that it is for the jury, and not for a witness, to assess the amount of damages for pain and suffering, and that the testimony of a witness as to his opinion of the amount of such damage is not admissible. Wilcox v. Leake, 11 La.Ann. 178. In Wilcox a doctor was alleged to have injured a patient during treatment. A witness attempted to testify as to the patient's personal injury damages, including pain and suffering and disfigurement, and suggest an amount for such damages. In upholding the trial court's exclusion of this testimony, the Supreme Court stated:
It is the peculiar province of a jury to make the assessment of damages in such cases, in which much discretion is vested in them.... Were it otherwise, the witnesses, and not the jury, would be the judges to determine the matter.
Intellectual and emotional losses, unlike financial losses, do not lend themselves to mathematical computation and analysis. Medical costs and lost wages are measured in dollars and cents; enjoyment and suffering are not. Although we require judges and juries to make monetary awards for general damages, we do so because justice requires some measure of compensation be given. However, such compensation is never a true measure or a true compensation for what is lost. The task of awarding general damages is a uniquely human endeavor, not only calling upon the trier of fact to consider the host of factors unique to each individual case, but also requiring the trier of fact to draw upon the virtually unlimited factors unique to us as human beings. Thus, general damage awards, both by definition and by nature, may not "be fixed with any degree of pecuniary exactitude". Boswell [v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978)] supra.

*354 For these reasons, economic theories which attempt to extrapolate the "value" of human life from various studies of wages, costs, etc., have no place in the calculation of general damages. Similarly, most courts hold that it is improper for counsel in civil cases to make arguments to juries based upon the amount of verdicts in similar cases. 15 ALR 3rd 1144. See also Hoffman v. All Star Insurance Corp., 288 So.2d 388 (La.App. 4th Cir.1974); and Reese v. Winn Dixie of Louisiana, Inc., 542 So.2d 68 (La.App. 3d Cir.1989). If arguments are improper which imply that some measure of precision is possible in making general damage awards, then, a fortiori, the introduction of expert testimony making similar implications is improper. Such testimony would imply certainty in an area where none exists and, as held in Wilcox, supra, would improperly invade the province of the jury. To the extent such testimony or similar evidence might have some marginal relevancy, any probative value would be substantially outweighed by the countervailing considerations. See LSA-C.E. Arts. 403 and 702.
Foster v. Trafalgar, supra at 285-286.
The above cited cases support a finding that evidence of loss of enjoyment of life by an expert is not allowed in Louisiana. However in the instant case, we need not reach this issue since in denying the plaintiff's motion for a new trial and/or judgment notwithstanding the verdict, the trial court indicated that he did not believe that the testimony of the proposed expert would assist the jury in determining how to compensate the plaintiff.
The general rule applicable to expert witnesses is set forth in La.Code Evid. art. 702 which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Pursuant to this provision, the question of the competence of an expert is a fact question within the sound discretion of the trial judge. His rulings on the qualifications of expert witnesses will not be overturned absent manifest error. Bourgeois v. Puerto Rican Marine Management, Inc., 589 So.2d 1226, 1236 (La.App. 4th Cir.1991), writ denied, 592 So.2d 1299, 1300 (La.1992); State v. Hebert, 559 So.2d 821, 831 (La.App. 3rd Cir.), writ denied, 563 So.2d 865 (1990); James v. State Farm Mut. Auto. Ins. Co.; 597 So.2d 555, 560 (La.App. 1st Cir.1992)
The trial court made the following observations concerning his assessment of this expert:
Plaintiff sought to have an expert witness quantify the value of his loss of enjoyment of life as a result of his injuries. In other words, this expert would attach a dollar value to Longman's pain and suffering and other damages. This court had previously heard Smith's testimony in a death case, where he attached a dollar value to the decedent's life based on life expectancy and various studies of how much money is spent on safety measures in order to save lives.

This court did not believe that this analysis would assist the jury in determining how to compensate Longman for his general damages. Longman, himself, was capable of explaining how his injuries have affected his lifestyle. Smith's quantitative efforts would not assist the jury in that respect. Additionally, the court feels that this expert does not rely upon a well-founded methodology in reaching his assumptions. (Emphasis added)
The fact that the trial judge had previously heard the testimony of this proposed expert in another case and had concluded that this proposed expert did not base his opinion on any well founded methodology does not constitute a sufficient basis for refusing to allow his testimony in the instant case. This is particularly true since the trial court did not indicate how recently he had heard the testimony of this expert, nor did he indicate whether the same methodology used in the prior case was also used in this case. Thus, if the trial court's decision to exclude the testimony was based solely on the testimony *355 heard in a prior case, the decision would be erroneous.
However, the statement by the trial judge indicates that the trial judge primarily based his decision excluding the testimony of Stan Smith on the facts that 1) the proffered evidence would not assist the jury in determining how to compensate the plaintiff for his general damages and 2) the plaintiff was capable of explaining how his injuries had affected his lifestyle. Having reviewed the proffered testimony we agree with the trial court's finding that the proffered evidence would not have assisted the jury in determining the value of the plaintiff's loss of enjoyment of life as a result of his injuries. Additionally, having reviewed the testimony of the plaintiff, we find that the plaintiff was extremely capable of explaining how his life had been affected by this accident. For these reasons, we find that the trial court did not abuse its discretion when it refused to allow Stan Smith to testify.

Quantum
In his eleventh and final assignment of error, plaintiff argues that the trial court erred in failing to increase petitioner's damages due to mental anguish.
An award for damages cannot be overturned on appeal unless the award is a clear abuse of discretion. Desmoreaux, supra at 231, Townley v. Manuel, 509 So.2d 515 (La.App. 3 Cir.1987). Moreover, in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), the Supreme Court made the following observation concerning appellate review of general damage awards:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. (Emphasis Added)
The jury awarded the plaintiff $80,000.00 for past, present and future physical pain and suffering and permanent disability, $20,000.00 for permanent disfigurement and scarring, and $55,000.00 for mental pain and anguish for a total general damage award of $155,000.00. A careful review of the record leads us to conclude that the trier of fact did not abuse its much discretion in awarding general damages of $155,000.00 to plaintiff.
The facts of this case are such that it is difficult to find any independent evidence of mental anguish caused solely by this accident. Rather, the evidence presented at trial presents a picture of an individual already experiencing severe problems prior to the accident. The plaintiff was admittedly a recovering alcoholic with a wide variety of stressful family problems prior to the accident. The depression which he attempted to prove was a direct result of the accident appeared to pre-date the accident. Additionally, in terms of the permanent scar on his face, both the jury and trial judge had an opportunity to view the plaintiff at trial.
The trial judge, in his reasons for denying plaintiff's request to increase the general damages, succinctly summarized the relevant evidence as follows:
... the jury was presented with an apparently robust, healthy, adult male who had missed practically no work, had suffered no broken bones or permanent physiological injuries, had substantially recovered from all of his injuries with the exception of residual problems with the scar over his eye, equilibrium and balance problems, and depression. However, the jury also heard evidence that his complaints of *356 equilibrium and balance problems predated the accident by many years and may have been related to pre-existing sinusitis. Additionally, the jury was presented with evidence of long-standing complaints of depression, as well as an earlier complaint of numbness in his face.
Based on our review of the entire record, we do not find that the award of the jury was abusively low. This assignment of error has no merit.

Liability of DOTD
The final issue to be addressed in this appeal is Commercial Union's sole assignment of error that the trial court erred in reversing the jury's finding that the Louisiana Department of Transportation and Development was 30% at fault.
At the time that the trial began, this case was a bifurcated case. The plaintiff had requested a jury trial as to the private defendants. However, since DOTD is a state agency, the trial judge was the sole trier of fact as to DOTD's liability. La.R.S. 13:5105. In response to a jury interrogatory requesting that the jury apportion fault, the jury assigned 70% fault to Earl J. Beechler, Jr. and 30% fault to DOTD. At the time that the jury answered the interrogatories assessing 30% fault to DOTD, the plaintiff had settled his claims against DOTD and all other defendants, with the exception of Commercial Union. Thus, the finding as to DOTD had no legal significance, particularly since the jury also found that Commercial Union, the only remaining defendant, did not provide UM coverage for this accident. Thus, it was not necessary for the trial judge to initially rule on DOTD's liability. However, in his motion for a new trial and/or judgment notwithstanding the verdict the plaintiff argued that 1) the jury erred in finding that Commercial Union did not provide UM coverage for this accident and 2) the jury erred in finding that DOTD was 30% at fault. In disposing of the plaintiff's motion, it was necessary for the trial judge to address the issue of DOTD's fault. The trial judge found that DOTD was not at fault and granted that portion of the plaintiff's motion for judgment notwithstanding the verdict which requested that the finding that DOTD was 30% at fault be set aside. The trial judge entered a judgment assessing 100% of the fault for the accident to Mr. Beechler.
Since DOTD had settled with the plaintiff at the time that the case went to the jury, the case was arguably no longer a bifurcated case. Nevertheless, because the jury's finding that DOTD was 30% at fault is clearly inconsistent with the trial court's finding that DOTD was not at fault, adherence to the tenets of La.R.S. 13:5101 dictates that the standard of review used to determine the liability of state agencies in bifurcated trials should be used to address the issue of DOTD's liability in this case. In McCullough v. Regional Transit Authority, 593 So.2d 731, 735 (La.App. 4th Cir.), writ denied, 595 So.2d 655 (La.1992), we noted that in cases involving bifurcated trials which resulted in inconsistent findings of fact by the trial judge and jury the normal appellate standard of manifest error is inapplicable. Rather, in such case, the appellate court must make its "own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury when those findings are inconsistent." McCullough, supra at 735. Our independent review of the facts of this case support a finding that DOTD was not at fault in the accident forming the basis of this litigation.
Plaintiff's cause of action against DOTD was predicated upon a claim that the accident was caused due to inadequate or worn markings on the highway. Commercial Union maintains that the testimony at trial showed that the accident occurred near a sharp turn in the road, that this section of the road was not lighted and that the road either lacked lane striping or the striping was so faded as to be nonexistent. Additionally, no reflectors were on the road and the road contained no warning signs to indicate the upcoming curve; nor were there speed limit signs. Commercial Union also places emphasis on the fact that Officer Bartholomew, the deputy sheriff who investigated the accident, felt that these factors contributed to the accident. These factors, according to Commercial Union support a finding that DOTD was 30% at fault. We disagree.
*357 Our review of the record indicates that no evidence was submitted by any of the parties to establish that any of the factors cited by Commercial Union contributed to causing this accident.
The trial judge correctly noted that the only relevant evidence presented concerning DOTD's liability was the testimony of Officer Bartholomew (the investigating officer), Mr. Beechler, and the plaintiff.
At the trial of the case Officer Bartholomew was asked if it wasn't true that "the lack of a speed limit sign, the lack of a center line, the lack of reflectors, the lack of warning signs in that curve" contributed to the cause of the accident. Opposing counsel objected to the question based on the fact that Deputy Bartholomew had not been qualified as an expert. When the trial court overruled the objection based on the fact that the opinion was not being elicited from him as an expert, Officer Bartholomew opined that he believed these factors contributed to the accident. However, on cross-examination Officer Bartholomew testified that the photographs in evidence indicated that the centerline of the highway and the white line along the edge of the roadway were visible. Moreover, when asked about causation on cross-examination, Officer Bartholomew stated that his personal opinion was that Mr. Beechler was probably tired or under the influence and that he fell asleep while driving. Based on this conclusion he agreed that if Mr. Beechler was asleep as he was driving through the curve, the absence of signs and/or faded striping would not have made any difference. Officer Bartholomew stated that one reason which led him to believe Mr. Beechler was asleep was the fact that brakes weren't applied. He opined that usually when a person is awake he will apply the brakes in an accident similar to the accident in this case.
Mr. Beechler denied falling asleep as he entered the curve. He admitted that the dividing line (although faint) was present and he acknowledged the existence of a sign indicating the narrowing of the roadway from four lanes to two. He denied seeing any curve signs, speed-limit signs or lights. Mr. Beechler also stated that as he entered the curve he kept going straight as he thought the oncoming lights were an automobile entering the highway from a connecting road. Significantly, he admitted to having made this same trip down this same highway on at least two prior occasions. The plaintiff merely testified that visibility was good at the time of the accident. Although it was dark at the time of the accident, plaintiff could see the headlights on Mr. Beechler's vehicle and the vehicle appeared to be making the curve initially before it slowly floated into plaintiff's lane.
In order to prevail, it was incumbent upon the plaintiff to prove that DOTD was either strictly liable or liable because of negligence. In order to recover under either theory, plaintiff must first establish the existence of a duty on the part of DOTD. While the basis for determining the existence of a duty is different in strict liability and ordinary negligence cases, the duty is the same. DOTD is only required to maintain the highways in a reasonably safe condition for motorists exercising ordinary care and reasonable prudence. Marziale v. Maney, 529 So.2d 504, 506 (La.App. 4th Cir.), writ denied, 533 So.2d 22 (La.1988).
DOTD is the State agency responsible for the design and maintenance of safe highways. However, it is not responsible for every accident occurring on state highways nor is it a guarantor of the safety of travelers thereon or an insurer against any and all injury which may result from defects in such highways. Marziale, id. at 506; citing Sinitere v. Lavergne, 391 So.2d 821 (La.1980) and Evans v. Salter, 450 So.2d 706 (La.App. 4th Cir.1984). In order to establish a breach of duty on DOTD's part under art. 2315, plaintiff must show that a hazardous condition existed, DOTD was actually or constructively aware of the hazardous condition, and DOTD failed to take corrective action within a reasonable time. Briggs v. Hartford Insurance Co., 532 So.2d 1154, 1156 (La.1988).
In rejecting the idea that plaintiff had established strict liability the court noted:
"Not every minor imperfection or irregularity in a roadway can be said to create an unreasonable risk of harm for purposes of *358 imposing strict liability.... A roadway does not present an unreasonable risk of harm if it is constructed and maintained in a condition reasonably safe for persons exercising ordinary care and reasonable prudence.... Proof that a thing presents an unreasonable risk of harm is not achieved by the mere showing that an accident or injury occurred." Mansour v. State Farm Mutual Auto. Ins. Co., 510 So.2d 1305, 1308 (La.App. 3 Cir.1987). (citations omitted)
The mere fact that the stripping was faded or that certain warning signs were lacking does not constitute sufficient evidence of a defective condition in the road, particularly in this case where the plaintiff presented no expert testimony to establish that the highway was defective or that any hazardous condition existed in the highway. None of this evidence was sufficient to establish strict liability on the part of DOTD.
Nor did the plaintiff present sufficient evidence to establish actionable negligence on the part of DOTD. Negligence is actionable only where it is both cause in fact and a legal cause of an injury. Legal cause requires a proximate relation between the actions of the defendant and the harm which occurs. This relation must be substantial in character. Campo v. Louisiana Power & Light Co., 560 So.2d 966, 967 (La.App. 4th Cir.1990), writ denied, 566 So.2d 396 (La. 1990) Sinitere v. Lavergne, supra at 825. The evidence indicates that the cause in fact of the plaintiff's injuries was not the failure of DOTD to properly maintain the striping or to provide adequate warning signs; rather, the accident was caused solely by Mr. Beechler's negligent operation of his vehicle. Mr. Beechler had traveled this road before. He admitted that the dividing line was in fact present on the highway. Furthermore, although the evidence was not sufficient to show that Mr. Beechler was intoxicated, the evidence certainly supports a finding of some impairment.
For the reasons herein given, that portion of the judgment finding that UM coverage was validly rejected is reversed. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are assessed against Commercial Union.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] None of the parties have appealed from the judgment of the trial court dismissing Boh Brothers and National Union Insurance Company.
[2] This provision was originally enacted in 1990 by the Legislature as Code of Evidence art. 411.1. However, the article was redesignated and is now codified as Code of Evidence art. 414.
[3] Additionally plaintiff submitted no evidence of any loss of past income. Nor was any evidence submitted to substantiate a finding of any future loss of wages.